## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| James Doe | C.A. No. 20-cv-1338 |
| vs. | Judge Carl J. Barbier |
| The Roman Catholic Church of<br>The Archdiocese of New Orleans,<br>et al | Mag. Dana C. Douglas |

<u>**MEMORANDUM IN SUPPORT OF MOTION TO REMAND**</u>

NOW INTO COURT, through undersigned counsel, comes Plaintiff, under the pseudonym James Doe, who respectfully moves this Court for an Order remanding this case to Civil District Court for the Parish of Orleans.  This matter should be remanded for the following non-exclusive reasons: (1) the mandatory abstention doctrine requires remand; (2) alternatively, the permissive abstention doctrine strongly favors remand; and (3) equity requires remand.

I.   BACKGROUND

   A.   **The abuse.**

   Plaintiff James Doe was among a host of children who were sexually abused by clergy within the Archdiocese of New Orleans over the past several decades.  As was his right, James Doe filed his Petition for Damages in Civil District Court.

   The state court Petition states the abuse as follows:

   In the late 1970's and early 1980's James Doe was an obedient child who willingly adhered to rules and authority. James Doe was a devout Catholic and respected, trusted, and admired the authority of the Catholic Church and its representatives including Father Michael Fraser and Father Paul Calamari.

   In 1978 James Doe was a 1st grade student at St. Raphael the Archangel school located in New Orleans, Louisiana.

   James Doe was selected to be an altar boy at the church, and regularly was requested to attend sleepovers at the church rectory.

On those rectory sleepovers, James Doe was fondled, groped and indecently handled by Father Fraser.

James Doe was also requested to have sleepovers at Father Calamari's family summer home on the Gulf Coast of Mississippi along with other young boys. During those visits Father Calamari would engage in wrestling with the children, which then lead to fondling and groping of . the children's genitals.

When James Doe was 11 years old, Father Fraser had sleep over that included James Doe and other young boys at St. Peter and Paul in St. Tammany Parish. The children were first taken out for pizza, and then before going to sleep Father Fraser instructed James Doe come to his bedroom to put Lubriderm lotion on his feet, to which Father Fraser explained to James Doe that it was *"just like washing of the feet."* James Doe observed that Father Fraser put a towel over his groin area, and when James Doe began to put lotion on the priest's feet, James Doe looked up and saw that Father Fraser was masturbating. When James Doe proceeded to leave the bed room, Father Fraser excitedly exclaimed, *"Boy you know what you just did to me, you gave my feet the best hand job ever!"* James Doe immediately felt sick to his stomach.

James Doe estimates that he was abused by Father Fraser and Father Calamari at least six times during the time he was in St. Raphael School.

*Petition*, at ¶¶ 26-32, attached as Exhibit "1" to Archdiocese Notice of Removal [Rec. Doc. 1-1].

Fraser's work history for the Archdiocese was extensive, as was his legacy of sexually abusing children. Fraser worked at Sts. Peter and Paul in Pearl River; St. Raphael the Archangel in New Orleans; St. Rita Church in New Orleans; and The Visitation of Our Lady in Marrero. His longest tenures were at St. Rita Church in New Orleans from 1976-81 and St. Raphael the Archangel in New Orleans from 1982-85. *See Archdiocese Directory*, attached as Exhibit "1".

Calamari's time working for the Archdiocese started in 1980, and he began his abuse immediately. From 1980–81 he worked as an Associate Pastor at St. Raphael Parish, New Orleans; from 1981–85, he was the Diocesan Director of Religious Education for the Archdiocese of New Orleans; from 1985–89, he was co-pastor at Our lady of Perpetual Help Parish, Belle Chasse; from 1991-94, he was placed in the Prefect in Residency Program at St. Stanislaus High School, Bay St. Louis, MS; from 1994-96, he was the Director of Residency Program at St. Stanislaus High

School, Bay St. Louis, MS; from 1999-200, he was the Associate Pastor at St. Mary of the Assumption Parish, Hockessin, DE; from 2000–03, he was the chaplain at Christiana Care Hospital, Newark, DE; and in 2003, he was either removed from ministry (as stated by the Archdiocese) or retired from ministry (as Calamari stated in his discovery responses). *See Archdiocese Directory*, attached as Exhibit "2". *See also Calamari Discovery Responses*, at 4, attached as Exhibit "3". Calamari also admitted to sexually abusing a minor when he was a teacher at St. John Vianney Preparatory High School in the 1970's before he was ordained a priest.

On November 2, 2018, the Archdiocese placed both Fraser and Calamari on the credibly accused list of pedophile priests ("Pedophile List"). The Archdiocese published the Pedophile List ostensibly to inform the public, for the first time, of the more than 57 pedophiles that it employed and/or supervised – eventually expanding the list to a current total of about 63. *Pedophile List*, attached as Exhibit "4". On the Pedophile List, under each name, the Archdiocese purportedly identified the date of a credible allegation and in which parish the pedophile priest was employed at the time of the sexual abuse.

However, the Archdiocese's Pedophile List fails to inform the public of the following material facts: (a) *all* of the allegations of abuse against an individual priest; (b) when the Archdiocese first learned of allegations of abuse; (c) any steps taken to remove, reprimand, and/or refer the pedophile to authorities; and (d) why it took the Archdiocese so long to inform the public of these predators. A number of these pedophiles, like Calamari, are still alive. Fraser died after filing suit (but before his deposition could be scheduled) on June 23, 2019.

Moreover, the Pedophile List is incomplete. Numerous Archdiocese-employed pedophile priests have not been identified. The Archdiocese is uniquely positioned to know which of its

employees were engaged in what criminal conduct.  In some cases, the Archdiocese concealed its knowledge from the public and authorities.

On February 6, 2019, Doe filed his Petition in Civil District Court for the Parish of Orleans. *Petition*, at 1.  All of his causes of action sound in Louisiana tort law under the Louisiana Civil Code and other statutes. He has alleged claims for negligence – LA. CIV. CODE arts. 2315-16 – fraudulent concealment, and public nuisance – LA. REV. STAT. § 14:403, *et seq.* – against the Archdiocese and other defendants. *Id.* at 13-19.  The defendants include the Archdiocese, Fraser, Calamari, and the Archdiocese's two insurers – the Archdiocese of New Orleans Indemnity, Inc., and the Catholic Mutual Relief Society of America.  *Id.* at 1-2.

**B.      Substantial Progress Was Made in the State Court Litigation.**

Since the suit was filed in state court more than a year ago, the litigation has proceeded at a substantial pace.   Defendants filed extensive exceptions seeking broad-ranging legal determinations including, but not limited to:  (1) the Declinatory Exception of Partial Lack of Jurisdiction over the Subject Matter, seeking dismissal insofar as plaintiff's petition requested the interpretation or application of Church law, policy, and doctrine (2) the Dilatory Exception of Nonconformity of the Petition, arguing that plaintiff had failed to set forth the names of all parties by filing suit under the fictitious name "James Doe"; (3) the Dilatory Exception of Vagueness or Ambiguity, arguing that plaintiff had made numerous vague and ambiguous allegations, failed to plead fraud with particularity, and failed to plead  sufficient  facts to allow defendant to investigate plaintiff's allegations and prepare its defense; (4) the Dilatory Exceptions of Prematurity, arguing that plaintiff had ignored the procedural requirements for actions based on sexual abuse of a minor; (5) the Peremptory Exceptions of No Cause of Action, arguing plaintiff had attempted to assert

numerous causes of action that are not supported by the factual allegations of the petition and/or are not cognizable under Louisiana law or applicable law; and (6) the Peremptory Exceptions of No Right of Action, arguing (a) plaintiff attempted to assert a breach of contract claim based on the Charter for the Protection of Children and Young People, and (b) plaintiff pled certain allegations regarding the Archdiocese's alleged actions or inactions with respect to others besides plaintiff himself.  *Archdiocese Exceptions*, attached as Exhibit "5".  All of the Defendants' exceptions were resolved by state court Judge Sidney Cates.  *Judgment*, attached as Exhibit "6".

All of the defendants answered the Petition, except for Fraser who died.  The Archdiocese and the Archdiocese of New Orleans Indemnity, Inc., answered on December 5, 2019, Rec. Doc. 1-2, at 260-274; Calamari answered on January 10, 2020, Rec Doc. 1-3, at 123-152; and the Catholic Mutual Relief Society of America answered on December 17, 2019, Rec. Doc. 1-2, at 275 & Rec. Doc. 1-3, at 10.

Plaintiff also propounded extensive discovery to the Archdiocese and Calamari.  Calamari answered discovery.  *Calamari Discovery Responses*, attached as Exhibit "7".  The Archdiocese also answered discovery, though it inserted baseless objections to most requests.  *Archdiocese Discovery Responses*, attached as Exhibit "8".

The Archdiocese also filed a motion for protective order, seeking to keep abuse related documents "confidential" and away from the public.  Plaintiff opposed the motion.  Judge Cates held oral argument and ruled that it would not enter a protective order but instructed the parties to only use the documents in this case until further review.  *Transcript*, at 19-20, attached as Exhibit "9".  The parties could not agree on the form of the judgment and submitted competing judgments to the Court.  *See Proposed Judgments*, attached as Exhibit "10".  However, the Archdiocese filed for bankruptcy and removed the case before the state court could enter judgment on the motion.

5

### C.     The Removal

On May 1, 2020, the Archdiocese filed for bankruptcy.  *Archdiocese Notice of Removal*, at 1.  On the same day, it filed a Notice of Removal of this suit from state court to the Eastern District of Louisiana.  *Id.*  The Archdiocese maintains that this Court has jurisdiction over the matter under 28 U.S.C. §§ 1334 and 1452(a).  *Id.*  It argues that jurisdiction is predicated on this case being "related to" its bankruptcy.

Consequently, the Bankruptcy removal statute is the *only* authority conferring jurisdiction of this case in this Court.  Until this case was removed, the litigation had proceeded apace in state court.  Under principles of equity, comity, and authority under 28 U.S.C. § 1334(c)(1)-(c)(2) and 28 U.S.C. § 1452, this Court should abstain from intervening and remand the case back to state court.

## II.     Remand is Required Pursuant to the Mandatory Abstention Doctrine, the Permissive Abstention Doctrine, and Equity.

This Court *only* has jurisdiction over this case under the authority of Section 1344.  *See* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under Title 11.").  As noted above, the Archdiocese views this case as being "related to" its bankruptcy claim, but not arising under it.  *Notice of Removal*, at 4.  Accordingly, this case may be subject to abstention and remand under three separate, but similar, frameworks.  *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 929 (5th Cir. 1999) (holding that remand may occur after a case is removed to federal court and may be used to remand a case by endorsing the majority rule that statutory abstention does apply to cases removed to federal court on the basis of bankruptcy jurisdiction).  *See also Verges v. Verges*, 2004 WL 1375304, at *3 (E.D. La. 2004) (Africk, J.)

(holding that actions may be remanded to state court when the mandatory abstention factors are met, as Section 1452(b) allows a court to remand a case "on any equitable ground.").

First, this case meets the mandatory abstention requirements of Section 1334, as this motion is being timely filed, the claim at issue is filed under state law and only related to a bankruptcy petition under Title 11, the claim could not have been brought in federal court without bankruptcy jurisdiction, and a timely resolution of the case can occur in state court. *See O'Rourke v. Cairns*, 129 B.R. 87, 90 (E.D. La. 1991); 28 U.S.C. § 1334(c)(2). Second, it meets the permissive requirements of abstention under Section 1334, as the interests of comity strongly weigh in favor of abstention. *See* 28 U.S.C. § 1334(c)(1) ("[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding . . . related to a case under Title 11."). And third, it meets the requirements for equitable remand under Section 1452, for many of the same reasons that abstention is appropriate. *See* 28 U.S.C. § 1452(b) ("The court to which [a case related to a bankruptcy claim] is removed may remand such claim or cause of action on *any equitable ground*.") (emphasis supplied).

### A.      The Mandatory Abstention Doctrine Requires Remand.

Section 1334(c)(2) outlines the situations in which a district court is *required* to abstain from hearing a case removed to that court because it is related to a bankruptcy claim.

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court ***shall*** abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2) (emphasis supplied).  A case that arises under the bankruptcy statute is called a "core proceeding," or one in which federal courts have exclusive jurisdiction pursuant to 28 U.S.C. § 1334(a). *Marshall v. Air Liquide-Big Three, Inc.*, Civ. No. 06-9619, 2007 WL 275898 at *2 n.17 (E.D. La. 2007) (Africk, J.).  A non-core proceeding, or one that may be remanded, is one that involves "pre-petition state law claims," as is the case here.  *Id.*

In other words, (1) if a motion to abstain is timely, (2) if the case is based on state law and only related to a bankruptcy petition, (3) if the federal court would have no jurisdiction without bankruptcy jurisdiction, and (4) if the case ca be timely adjudicated, then the "district court shall abstain" from hearing it.  *See Verges v. Verges*, 2004 WL 1375304 at *2 (E.D. La. 2004) (Africk, J.).

"Section 1334(c)(2) does not provide any guidance on what constitutes a timely motion for mandatory abstention."  *Id.* (quotation omitted).  Instead, "[c]ourts have generally adopted a flexible, case-specific approach in determining whether a motion for mandatory abstention is timely."  *Id.* (*quoting Channel Bell Associates v. W.R. Grace & Co.*, 1992 WL 232085 at *5 (S.D.N.Y. 1992)).  In *Verges*, Judge Africk held that a motion filed within 30 days of removal was timely.  *Verges*, 2004 WL 1375304 at *2.

Here, approximately two months have lapsed.  While the state court litigation substantially progressed, the bankruptcy is in its infancy.  The bankruptcy has primarily addressed preliminary, perfunctory motions thus far.  Moreover, a *Motion to Dismiss* the bankruptcy has been filed which may require months of discovery before ultimate resolution.  (*See infra* discussion of *Motion to Dismiss*.)  If the *Motion to Dismiss* is granted, then the bankruptcy will be dismissed and federal jurisdiction along with it.  The motion to dismiss may well delay other important bankruptcy milestones, like the scheduling of a bar date and production of sexual abuse related documents.

Additionally, the Covid-19 pandemic has significantly slowed all litigation, mitigating any slight delay.   Accordingly, this *Motion to Remand* is timely.

With regard to the other factors, there is no dispute that this case is based on state law claims of negligence, fraudulent concealment, and personal injury.  *See, generally, Petition*, at 1-20.  Similarly, the Defendants themselves admitted in their removal papers that this case is only "related to" a bankruptcy proceeding, and not arising under it.  *See Notice of Removal*, at 3.  This Court would not have jurisdiction over this case other than under the bankruptcy jurisdiction provided by Section 1334.

Finally, the case can be timely adjudicated in state court.  When this removal occurred, Plaintiff was in the throes of discovery, readying for depositions, and preparing to move to schedule a prescription trial.  *See* La. Code Civ. Proc. Art. 929 (""If the peremptory exception [of prescription] has been filed after the answer, but at or prior to the trial of the case, it shall be tried and disposed of either in advance of or on the trial of the case."); La. Code Civ. Proc. Art. 931. *See also Doe v. Archdiocese of New Orleans,* 823 So.2d 360 (La. App. 4th Cir. 2002) (noting, in church abuse case, that plaintiff was entitled to evidentiary hearing on prescription to resolve issues of fact and questions of law).

Because the Plaintiff is alleging that the Defendants fraudulently concealed their knowledge of these abusers and their crimes, determining whether the claims are prescribed is a fact-intensive inquiry, requiring multiple witnesses, discovery, and a trial, all under Louisiana state law.  Plaintiff propounded discovery on Calamari and the Archdiocese.  Calamari answered discovery, and the Archdiocese responded to the discovery requests, waiting to produce the documentation until the state court entered its judgment on the *Motion for Protective Order*.  The

case was moving forward.  Determining whether the claim had prescribed is an application of Louisiana law.  This case would be timelier adjudicated in state court than here.

The requirements of mandatory abstention are met in this case.[1]  Under the authority granted by Section 1452(b), which permits this Court to remand this case to state court "on any equitable ground," the Plaintiff respectfully requests that the Court hold that mandatory abstention applies and the case must be remanded to state court.

### B.    Alternatively, the Permissive Abstention Doctrine Requires Remand.

28 U.S.C. § 1334(c)(1) outlines "permissive abstention," which provides courts with "*broad discretion* to abstain from hearing state law claims whenever appropriate 'in the interest of justice, or in the interest of comity with State courts or respect for State law.'" *Matter of Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996) (*quoting* 28 U.S.C. § 1334(c)(1) (emphasis supplied)).  As defined by the Unites States Supreme Court, comity is "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."  *Younger v. Harris*, 401 U.S. 37, 44 (1971).  This discretion to abstain is intertwined with the court's power to remand a state court case related to a bankruptcy proceeding "on any equitable ground." 28 U.S.C. § 1452(b).  *See Orion Refining Corp. v. Fluor Enterprises, Inc.*, 319 B.R. 480, 488 (Vance, J.).

---

[1] Although some courts have indicated that the argument for mandatory abstention is not available in a "personal injury tort" claim against the bankruptcy debtor, *see Adelsflugel v. Consolidated Aluminum Corp.*, 2014 WL 4181002 (M.D. La. 2014), and *Wright v. River Region Medical Corp.*, 2012 WL 3114536 (S.D. Miss. 2012), the issue is a moot one here, where the legal analysis of mandatory, permissive, and equitable abstention significantly overlap, and the facts and circumstances in this case overwhelmingly favor remand.

("The factors that a district court considers to determine whether it should permissively abstain also support equitable remand under 28 U.S.C. § 1452. . . .").

The Court must weigh several factors "to decide whether permissive abstention or equitable remand is warranted." *Id.* The factors are: "(1) forum non conveniens; (2) bifurcation of the civil action; (3) centralization of the entire action in one court; (4) expertise of the particular court; (5) duplicative or wasteful use of judicial resource; (6) prejudice to involuntarily removed parties; (7) comity issue; and (8) a diminished likelihood of inconsistent results." *Id.* (*citing Browning v. Navarro*, 743 F.2d 1069, 1077 n.21 (5th Cir. 1984)).   And, "[b]ecause the Court is vested with 'broad discretion to grant or deny a motion to remand on any equitable ground,' *any one* of the relevant factors may provide a sufficient basis for equitable remand.'" *Jackson v. Johnson & Johnson*, Civ. No. 19-9983, 2019 WL 2537837 at *3 (E.D. La. June 20, 2019) (Feldman, J.) (emphasis supplied).  Because the application of these factors is so case-specific, a survey of cases in which remand was held to be equitable is instructive.

In *Jackson*, *supra*, the suit that was removed to federal court was a product liability claim for personal injuries suffered due to the use of talcum powder.  *Id.* at *1.  The court, in determining that equitable remand was appropriate, first noted that "with respect to state law predomination and comity, the talc claims asserted against J&J involve only questions of state law. . . ." *Id.* at *3. The court noted that the plaintiff would be prejudiced by a refusal to remand because the plaintiff had "filed this case over a year ago, and discovery [wa]s underway," and that removing the case would delay the resolution of the claims by months or possibly years.  *Id.*  Moreover, the interest of judicial economy also supported remand, as the state court had been considering the claims for more than a year, and the "re-litigation of plaintiff's Louisiana-based claims in federal court would needlessly duplicate judicial resources that have already been committed in this case." *Id*.

In *Wells Fargo Bank, N.A. v. Flash Vos, Inc.*, Civ. No. 05-2660, 2006 WL 6503036 at *3 (E.D. La. 2006) (Feldman, J.), the court, in deciding a motion to remand, noted that "a determination of whether abstention would be appropriate informs and supplements the remand analysis." *Id.* (citing *Massey v. Genco,* 1997 WL 61449, at *3 (E.D. La. 1997) (Vance, J.); *Hills v. Hernandez,* 1998 WL 241518, at *3 (E.D. La. 1998) (Clement, J.); *O'Rourke v. Cairns,* 129 B.R. 87, 90 (E.D.La.1991) (Feldman, J.)). The court held that remand was "patently appropriate" because the case was a "non-core proceeding involving purely state law claims and implicating principles of comity" that shifted the balance of the court's discretion in favor of remand. *Wells Fargo*, 2006 WL 6503036 at *3. The court also noted that remand was bolstered by the fact that "most (if not all) of the factors of mandatory abstention" were met. *Id.* at *4; *see also KSJ Dev. Co. of La. v. Lambert*, 223 B.R. 677, 680 (E.D. La. 1998) (Feldman, J.). The court also took into consideration the Defendants' reasons for removing the case, nothing that "serious questions as to whether defendants are indeed attempting to forum shop and engage in other dilatory tactics lends support to this Court's decision to exercise its discretion in favor of remanding this action on any equitable ground." *Id.*

In *Lambert*, *supra*, the court remanded a state law claim that was related to a bankruptcy proceeding, noting that in reaching its decision, the "foremost concern is comity. . . ." *Lambert*, 223 B.R. at 680. The case solely implicated Louisiana contract law; the mandatory abstention factors weighed in favor of remand; there was no basis of federal jurisdiction other than via bankruptcy jurisdiction; and the state court was capable of adjudicating the claims in a timely fashion. *Id.*

Here, the principles of comity and state law predomination weigh heavily in favor of remand. The claims of negligence, fraudulent concealment, and public nuisance all sound in

Louisiana state law.  This is a non-core proceeding, as the suit was filed before the bankruptcy

petition, in state court.  The only basis of jurisdiction this Court has is via bankruptcy jurisdiction.

Plaintiff will be prejudiced by the refusal to remand because, as in *Jackson*, the Plaintiff "filed this

case over a year ago, and discovery is underway."  The case could be delayed for months or even

years if this Court exercises its jurisdiction.  And, like in *Jackson*, here the interest of judicial

economy is served by remanding the case to a court that has had the case for more than a year, and

has overseen discovery battles which should lead to a timely trial on the issue of prescription.

### C.    Additional Equitable Factors Favor Remand.

Equity's basic underpinning of fairness dictates remand.  While equitable remand bears

heavily upon the factors identified under both mandatory and permissive abstention, this Court has

added additional factors directed to asses any impact a remand may have on bankruptcy

proceedings.  This Court has identified at least the following factors:

> (1) [T]he convenience of the forum; (2) the presence of non-debtor parties; (3)
> whether the case should be tried as a whole in state court; (4) the duplicative and
> uneconomic effect of judicial resources in two forums; (5) the lessened possibility
> of inconsistent results; (6) whether the state court would be better able to handle
> issues of State law; (7) the expertise of the Bankruptcy Court; (8) the degree of
> relatedness or remoteness to the main bankruptcy case; (9) prejudice to
> involuntarily removed parties; (10) whether the case involves forum shopping; (11)
> the burden on the Bankruptcy Court's docket; and (12) considerations of comity.

*Lea v. Johnson & Johnson*, 2019 WL 3335143, at *2 (E.D. La. 7/24/19) (Fallon, J.) (quoting *In re*

*Ciclon Negro, Inc.*, 260 B.R. 832, 837 (Bankr. S.D. Tex. 2001) (citing *Browning v. Navarro*, 743

F.2d 1069, 1076 n.21 (5th Cir. 1984)).

In *Lea*, this Court succinctly applied these factors and ordered remand:

> The Court believes equitable grounds support remand of the instant matter. First,
> the sole basis for federal jurisdiction is J&J's assertion the case is related to Imerys'
> bankruptcy proceedings under § 1452(a). There is no federal diversity jurisdiction,
> and J&J has not asserted an independent jurisdictional basis. Second, Plaintiff raises

solely Louisiana state law product liability claims, none of which include unique or complex federal bankruptcy issues. R. Doc. 16-1 at 26. Indeed, Plaintiff's claims "are state law actions at their core." See Removed State Court Talc Actions, 2019 WL 2191808, at *2 (remanding more than forty similar cases against J&J in the interests of equity pursuant to § 1452(b)). Comity thus favors remand. See Giles v. NYLCare Health Plans, Inc., 172 F.3d 332, 340 (5th Cir. 1999). Third, with the exception of J&J, a Delaware-based corporation, and Imerys, the remaining parties are non-debtors who are Louisiana citizens. R. Doc. 16-1 at 2. Fourth, and most significantly, Plaintiff's claims are remote from and have a marginal degree of relatedness to the Imerys bankruptcy proceedings. See In re Imerys Talc America, Inc., et al., 2019 WL 3253366, at *3 (finding J&J failed to demonstrate Debtors' duty to indemnify and concluding "there is no relation [between Plaintiffs' claims and] the Debtors' bankruptcy proceedings").

Lea, 2019 WL 3335143, at *3.

As in Lea, the same (and even more) equitable reasons weigh in Plaintiff's favor: (1) the state court forum can easily resolve the crucial issues of prescription and provide a value for sex abuse claims; (2) three non-debtor parties are also named defendants – Calamari, the Archdiocese of New Orleans Indemnity, Inc., and the Catholic Mutual Relief Society of America; (3) the case could (and should) be tried as a whole in state court to answer a crucial question looming over the bankruptcy – the value of these sex abuse claims; (4) allowing the state court to proceed to judgment would not unnecessarily duplicate resources, since a jury trial has been requested and the bankruptcy court does not have the authority to resolve the merits of this claim; (5) there is no risk of inconsistent results, where the bankruptcy court does not have the authority to resolve the merits of this claim in which a jury has been requested; (6) state court is better equipped to handle the merits of these claims, since it enjoys extensive expertise in presiding over personal injury claims, has a built-in procedural mechanism to resolve prescription through an evidentiary hearing, and affords the opportunity for a jury to ultimately decide the value of these claims; (7) the expertise of the bankruptcy court to resolve a state-law personal injury claim is likely limited; (8) this litigation does not concern the debtor's assets, thereby limiting its relatedness to the

bankruptcy; (9) prejudice to the unrelated parties of proceeding in state court is likely a wash, since Calamari's liability is distinct from the Archdiocese's and the defendant insurer's coverage defenses are somewhat connected to what this particular plaintiff knew when; (10) the Archdiocese filed for bankruptcy primarily to forum shop in order to gain a litigation advantage over sexual abuse plaintiffs; (11) remanding the case will alleviate the burden on the bankruptcy court by allowing the state court to make important rulings, such as prescription and valuation; and (12) comity favors remand for all of the aforementioned and following reasons.

The factor concerning forum shopping deserves special attention.  Not only was forum shopping the principle reason for the removal but it was also the principle reason for filing the bankruptcy itself.  The Archdiocese removed the sexual abuse cases to federal court in order to (a) prevent Archbishop Aymond's deposition, (b) prevent fact depositions, and (c) prevent the Archdiocese's corporate representative deposition.  The Archdiocese also removed this case to federal court to prevent the public disclosure of documents showing what the Archdiocese knew, when it knew it, and what it did (and did not) do with that knowledge.  Bankruptcy also delays testimony from defendants and other key fact witnesses who are of older age and at an increased risk of losing their capacity to testify.

### 1. The Archdiocese's Bankruptcy Was Filed in Bad Faith To Achieve Nothing More Than a Litigation Advantage.

Before the Bankruptcy Court, the Committee of Unsecured Creditors ("Committee") filed a *Motion to Dismiss the Bankruptcy* based on the Archdiocese's bad faith.  *Motion to Dismiss*, attached as Exhibit "11".  The motion argues that the Archdiocese filed the bankruptcy solely to prevent the state court abuse cases from obtaining discovery, deposing Archbishop Aymond, informing the public of the Archbishop's knowledge and misdeeds, and stripping the state court

of an opportunity to decide the issue of prescription as well as depriving a state court jury from determining the value of these claims.

The motion extensively analyzes the Archdiocese's financials, the Archdiocese's omissions, and the sworn testimony of the Archdiocese representatives who testified that the Archdiocese was not insolvent when it filed the bankruptcy and will not become insolvent after it pays all allowed claims:

COUNSEL:          So Father Carr, is the Archdiocese insolvent?

FATHER CARR:      No, it is not insolvent.

COUNSEL:          Why did it file bankruptcy if it was not insolvent?

FATHER CARR:      Our intent was to pay 100 percent of all allowed claims….

*See Transcript of Section 341(a) Hearing*, at 99, attached to *Motion to Dismiss*, as Exhibit 5.

COUNSEL:          If the Archdiocese was not in bankruptcy, would it be solvent?

FATHER CARR:      Yes.

COUNSEL:          So it is solvent outside of the bankruptcy process and it is solvent given the possible outcome of the bankruptcy process?

FATHER CARR:      Yes.

COUNSEL:          And I know I asked you this question before, but we've had a few questions in between and I just want to ask you one time again: Why did the Archdiocese file bankruptcy if it was solvent without the bankruptcy process?

FATHER CARR:      Like I said once before, to pay 100 percent of our allowed claims.

*Id*. at 102-103.  Rather than re-hash all of the facts, arguments, and law of the *Motion to Dismiss*, Doe adopts and incorporates them here by reference.  See Exhibit "10" at 8.

This type of forum shopping by the Archdiocese is further supported by a memorandum drafted by counsel for the Archdiocese-related entities in the bankruptcy. Douglas Draper, counsel for more than 140 Archdiocese-related non-debtor entities ("The Apostolates"), sent a memorandum to counsel for Plaintiff (presumably) in an effort to garner representation of the committee of unsecured creditors prior to then being retained by the listed Apostolates in the bankruptcy. The Apostolates are aligned with the Archdiocese and therefore adverse to the committee. *See Douglas Draper Notice of Appearance*, attached as Exhibit "12".

The memorandum details litigation strategies in favor of and against the bankruptcy filing. The memorandum states that one of the strategies for the Archdiocese is to achieve a forum in which prescription will be decided by judges more likely to dismiss the abuse cases:

> The filing of a Chapter 11 results in the imposition of an automatic stay with respect to all pending cases against a debtor absent the lifting of the automatic stay by the Bankruptcy Court. All discovery in the various state court cases will shut down. More important, however, is the ability of the Church to remove the pending cases to federal court. 28 U.S.C. § 1342 permits the removal of cases "arising in, arising under or related to a Chapter 11" case. In order to move the cases back to state court, the plaintiffs will have to file motions with either the United States District Court or Bankruptcy Court to abstain or remand. <u>The Court hearing the prescription issue will now be a federal court, as opposed to the current state court system. Imagine the prescription issue being decided by Judge Feldman or another judge with his judicial philosophy</u>.

*Draper Memorandum*, at 2 (emphasis supplied), attached as Exhibit "13".

### 2. The Archdiocese Filed the Bankruptcy to Stop the Release of Documents and Depositions.

The state court denied the Archdiocese's *Motion for a Protective Order* in this case. *Transcript*, at 19-20. Although the court instructed the parties only to use the documents in this case, the consequences were unacceptable to the Archdiocese – any document attached to a pleading filed into the state court record would not be filed under seal, and the public would have

a right to see them.   It would only be a matter of time before it became public regarding what the Archdiocese knew, when it knew it, and what it did or failed to do with its knowledge.

The Archdiocese's fear is well-founded.  The manner with which the Archdiocese handled abuse allegations was pursuant to a uniform policy, practice, and procedure – cover-up, silence the victim, and move the priest to a different parish.   In a similar state court case, *J.W. Doe v. Archdiocese of New Orleans*, 19-3947 (Orleans Parish Civ. Dist. Ct.), the Archdiocese produced documents that exposed its policy, practice, and procedure of concealing abuse with a different priest.   Like in *J.W.*, the documents in this case likely will be equally damning.  *See generally Motion to Depose Attorneys*, attached UNDER SEAL as Exhibit "14" (describing the details of the Archdiocese's knowledge and actions in response to similar abuse allegations).  *See also generally Motion to Declassify Documents*, attached as Exhibit "15" (requesting numerous documents be stripped of their "confidentiality" designations).  (Numerous news outlets moved the court for publication of these documents).  The Archdiocese filed for bankruptcy and removed these cases to this Court before the state court judge could rule.   The pleadings are being filed under seal pursuant to the limited, temporary protective order entered by the state court judge in J.W. Doe.  *See Judgment*, attached as Exhibit "16".

Depositions based on these documents would similarly be devastating.   Archbishop Aymond, as the sole person making the final decision about which priests to place, not place, or remove from the Pedophile List, is a fact witness in each of the abuse cases.  He would also have first-hand knowledge of what the Archdiocese knew, when it knew it, and what it did with that knowledge.  As the Vicar General from 1996 to 2000, Archbishop Aymond is uniquely positioned to have been the designated person within the Archdiocese to "handle" sexual abuse allegations.  *Aymond Biography*, attached as Exhibit "17".  From 1986-2000, Archbishop Aymond served as

resident-rector of the Notre Dame Seminary – the site where numerous abuses occurred.  *Id.*  As Archbishop, Aymond maintains secret files of abuse allegations in his office and maintains direct access to the priest personnel files stored in a vault.  *Deposition of Archdiocese Archivist Emilie Leamus as Corporate Representative of Records*, at 48-50 & 97-100, attached as Exhibit "18".

### 3.     The Defendants Are Aging.

Delay runs against litigation.  Defendant Fraser died after suit was filed but before he could be deposed.  Defendant Calamari is 76 years old, having been born on May 8, 1944.  And since the bankruptcy was filed, George Brignac, one of the most prolific Archdiocesan pedophiles, has died.  Even Archbishop Aymond is 70, having been born on November 2, 1949.

*Louisiana Code of Civil Procedure* article 1573 specifically provides for an expedited trial setting if a party to the case is 70 years old or older.  LA. CODE CIV. PROC. Art. 1573 ("The court shall give preference in scheduling upon the motion of any party to the action who presents to the court documentation to establish that the party has reached the age of seventy years . . . .").  The longer this case stays in federal court, the more opportunities the Archdiocese has to continue to hide its misconduct, and the more likely the pedophile priests will die before receiving civil or criminal justice.

Overall, the principles of comity, mandatory abstention, permissive abstention, and equitable remand *all* weigh heavily in favor of remanding this case to the state court from which it came.

### III.    This Court Need Not Decide the Issue of Lifting the Bankruptcy Stay to Remand.

Section 362 of the Bankruptcy Code places an automatic stay on all proceedings against a bankruptcy petitioner who has filed under Chapter 11.  *See* 11 U.S.C. § 362.  When the Archdiocese filed its petition for bankruptcy, the state court proceedings were automatically

stayed.  This stay, however, did not prevent the Archdiocese from then removing this action from state court to federal.  The law is mixed on whether a district court may remand a case like this without necessarily lifting the stay, but the following cases show that this Court is within its authority to remand this case to state court without addressing the bankruptcy stay in place.

In *Verges*, 2004 WL 1375304, Judge Africk remanded the non-core suit to state court without even considering the nature of the stay or whether it should be obeyed.  Similarly, in *Lambert*, 223 B.R. 677, Judge Feldman granted a motion to remand without analyzing whether such a decision was affected by the automatic stay.

However, in *Liljeberg Enterprises Int'l., LLC v. Vista Hospital of Baton Rouge, Inc.*, Civ. No. 04-2780, 2004 WL 2725965, at *1-2 (E.D. La. 2004) (Vance, J.), the court refused to remand a claim to state court because it found that the automatic bankruptcy stay prohibited it.  Similarly, in *Jones v. JCC Holding Co.*, Civ. No. 01-0573, 2001 WL 537001, at *4 (E.D. La. 2001) (Livaudais, J.), the court held that a motion to remand against two debtors in a bankruptcy action was automatically stayed by Section 362.

Upon further viewing, however, it appears that *Liljeberg* and *Jones* represent the minority view.  *See Turbine Powered Tech. LLC v. Crowe*, 2019 WL 4054093, at *6 (W.D. La. Aug. 12, 2019) ("This Court's review of *Liljeberg* and its history indicates that its holding is the sole outlier in the sizable body of precedent.") (*citing Henry v. Cooper/T. Smith Stevedoring Co.*, 2016 WL 6080992, at *2 (E.D. La. 2016); *Hudgens v. Deer Valley Home Builders, Inc.*, 2009 WL 2878052 (W.D. La. 2009); *Schaffer v. Atl. Broadcasting of Lindwood NJ, LLC*, 2011 WL 1884734, at *4 (D.N.J. 2011); *Sanders v. Farina*, 67 F.Supp.3d 727, 730 (E.D. Va.,2014); *McCratic v. Bristol-Myers Squibb & Co.*, 183 B.R. 113, 115-16 (N.D. Tex. 1995); *cf. Lindley Contours, LLC v. AABB Fitness Holdings, Inc*., 414 Fed. Appx. 62 (9th Cir. 2011) (finding that remand "has no impact on

the debtor's assets, does not impact the relative position of the creditors, and would not interrupt debtor's breathing spell.")); *see also Miracle-Ear, Inc. v. Premier Hearing Aid Ctr., L.L.C.*, 2010 WL 299262, at *1 (W.D. La. 2010) ("While the filing of a bankruptcy petition generally operates as a stay on enforcement actions against a debtor, 11 U.S.C. § 362, it does not prevent a federal court from remanding an action in which subject matter jurisdiction is lacking."). In *Henry*, Judge Africk, citing many of the same cases as the court in *Crowe*, simply held that an automatic stay does not preclude a remand. *Henry*, 2016 WL 6080992 at *2.

The reasoning of these courts, in concluding that a remand does not violate the automatic stay provided by Section 362, was best explained by the Eastern District of Virginia:

> The issue is not whether the remand should fall into an exception to Section 362, but rather whether a remand is a "continuation" of an action covered by Section 362. For the reasons noted here, and as many courts have found, a remand does not constitute a continuation of a preexisting action. Moreover, a remand under Section 1452(a) is quite unlike a remand pursuant to 28 U.S.C. § 1441; the former may issue "on any equitable ground" whereas the latter is a mandatory consequence of a lack of jurisdiction or because removal was otherwise improper. In summary, the automatic stay does not bar a remand pursuant to 28 U.S.C. § 1441.

*Sanders*, 67 F.Supp.3d at 730.

This makes sense. A remand is simply a lateral move from one court to another, it is not a "continuation" of an action that advances either side's position in any way. The Fifth Circuit itself has held that, "[n]otwithstanding the issuance of an automatic stay, courts retain jurisdiction to determine the applicability of the stay to litigation pending before them, *and to enter orders not inconsistent with the terms of the stay*." *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir. 1990) (emphasis supplied). And as a remand is not an adjudication on the merits, it does not jeopardize a debtor's protection provided by the stay, it merely sends the case back to the proper state court. *See Crowe*, 2019 WL 4054093 at *7.

The majority of cases hold that remand to state court of a non-core proceeding does not violate the automatic stay provisions of the bankruptcy code.  For this Court to remand would be in line with the spirit and purpose of the bankruptcy code, it would not violate the purposes of a stay, and it would be squarely undergirded by principles of equity, comity, and justice.

## III.   CONCLUSION

For the above and foregoing reasons, the Plaintiff, JW Doe, respectfully requests that this Court remand this case to the Orleans Parish Civil District Court.

Respectfully submitted:

__/s Soren E. Gisleson_____
**SOREN E. GISLESON (#26302)**
**JOSEPH E. "JED" CAIN (#29785)**
Herman, Herman & Katz, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Office: 504-581-4892
Fax: 504-561-6024
Email: SGISLESON@hhklawfirm.com
Email: JCAIN@hhklawfirm.com

AND

**JOHN H. DENENEA, JR. (#18861)**
**SHEARMAN~DENENEA, L.L.C.**
4240 Canal Street
New Orleans, LA  70119
Telephone: (504) 304-4582
FAX: (504) 304-4587
jdenenea@midcitylaw.com

AND

**RICHARD C. TRAHANT (# 22653)**
**ATTORNEY AT LAW**
2908 Hessmer Avenue
Metairie, LA 70002
Telephone: (504) 780-9891

22

FAX: (504) 780-9891
Email: trahant@trahantlawoffice.com

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served on all counsel of record by operation of the Court's electronic filing system on this 7th  day of July, 2020.

S/Soren E. Gisleson