From: Douglas Draper <ddraper@hellerdraper.com>

Sent: Wednesday, March 18, 2020 6:20 PM

To: Soren Gisleson <SGISLESON@hhklawfirm.com>

Subject: Call

Placed a call to you based on Phil's email. I am available tomorrow to discuss with you and your team. I am in the process of finalizing a memo going through issues and matters to consider. I have looked at the docket and bk plans for at least 15 of the filed cases.

Sent from my iPhone

CONFIDENTIALITY NOTICE:

INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper, Patrick, Horn & Manthey, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:

Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

EXHIBIT 12

| | |
|---|---|
| **From:** | Deborah Hepting |
| **To:** | Richard Trahant; jdenenea@gmail.com; Soren Gisleson; Jessica C. Quin |
| **Cc:** | Douglas Draper |
| **Subject:** | Potential Bankruptcy |
| **Date:** | Monday, March 30, 2020 5:08:48 PM |
| **Attachments:** | Document-20200317133304.docx (00371971-12xBDDDE).docx |
| | Appendix A Workable 9-13-19.xlsx |
| | Appendix B Workable 9-13-19.xlsx |

Please see attached.

Thanks,

Deborah A. Hepting

**Heller, Draper, Patrick, Horn & Manthey, L.L.C.**

650 Poydras Street – Suite 2500

New Orleans, LA 70130

Direct: 504 299.3312

Fax: 504 299.3399

Email: dhepting@hellerdraper.com

CONFIDENTIALITY NOTICE:
INFORMATION IN THIS MESSAGE IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE RECIPIENT(S) NAMED ABOVE. This message is sent by or on behalf of an attorney of the law firm Heller, Draper, Patrick, Horn & Manthey, L.L.C. and is intended only for the use of the individual or entity to whom it is addressed. This message contains information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or is not the employee or agent responsible for delivering this message to the intended recipient, please do not read, copy, use or disclose this communication to anyone. If you have received this communication in error, please notify us immediately by reply e-mail or by telephone at 504-299-3300 and immediately delete this message and all of its attachments.

Circular 230:
Pursuant to federal tax regulations imposed on practitioners who render tax advice ("Circular 230"), we are required to advise you that any advice contained in this communication regarding federal taxes is not written or intended to be used, and cannot be used by any person as the basis for avoiding federal tax penalties under the Internal Revenue Code nor can such advice be used or referred to for the purpose of promoting marketing or recommending any entity, investment plan or arrangement. Thank You.

The following is a memorandum in connection with a potential Chapter 11 by the Archdiocese of New Orleans ("<u>Archdiocese</u>"). This memorandum will address the following issues:

1. Benefits of a Chapter 11 to the Archdiocese;

2. Rights of the Plaintiffs in a Chapter 11;

3. The likely plan to be filed by the Archdiocese;

4. Key Chapter 11 issues addressed in the various Chapter 11 cases;

5. Planning prepetition for post-petition issues; and

6. Team Needed.

As of the writing of this memorandum, over twenty (20) Archdioceses have filed for relief under Chapter 11. The latest of the cases filed was the Archdiocese of Buffalo, New York. Over fifty percent (50%) of the cases have resulted in confirmed plans of reorganization with the average settlement amounts per victim ranging from a low of approximately $50,000.00 to in excess of $1,000,000.00 (see Chart 2). The duration of the cases and the legal costs incident to the cases are set forth on Chart 1.

The bankruptcy cases filed by the various Archdioceses have placed a legal spotlight on the secular and legal relationships between the diocesan debtor and its constituent parishes, schools, cemeteries and other entities that operate under the bishop's authority. The sexual abuse cases are different than any other mass tort Chapter 11s and have been characterized as slugfests with unique issues raised such as "religious freedom." The Church, in each of the cases, has been aggressive in its defense of transfers of its property, claiming that it does not own property but, rather, that the property is owned by parishes or that the Bankruptcy Code or certain of its provisions do not apply to the Church.

**BENEFITS OF A CHAPTER 11 FILING**

The filing of a Chapter 11 is no longer viewed as a badge of shame or failure. Chapter 11 filings have been used by companies with mass tort exposure in an effort to control the costs of the litigation process, limit the recovery of known claimants, change the court hearing the dispute, remove litigation over the dispute from juries, and limit or cut off the rights of unknown and future claimants.

Aside from the legal and economic benefits the Archdiocese will receive as a result of a Chapter 11 filing, it would also allow the Church to change the tenor of its position. Rather than fighting the emotional issue of its cover up of sexual abuse, the Church will announce that it has filed in order to provide to the injured plaintiffs a quick, fair and efficient means of compensation. The Church will claim that it is embarking on an open and transparent process.

The issues the Church currently faces related to its hiding of abuse, its wrongdoing for over the last fifty (50) years and its efforts to thwart claims will be replaced by changing the dialog to one about money and compensation. The goal of the Church will be to desensitize the matter and change the discussion to purely a monetary discussion. The deception that will now take place will be one of assets, transfers, value, and the universe of asserted and unasserted claims and the valuation of those claims. This new dialog will not be as incendiary for the Church and will not cause a problem with its parishioners.

The filing of a Chapter 11 results in the imposition of an automatic stay with respect to all pending cases against a debtor absent the lifting of the automatic stay by the Bankruptcy Court. All discovery in the various state court cases will shut down. More important, however, is the ability of the Church to remove the pending cases to federal court. 28 U.S.C. § 1342 permits the removal of cases "arising in, arising under or related to a Chapter 11" case. In order to move the cases back to state court, the plaintiffs will have to file motions with either the United States District Court or Bankruptcy Court to abstain or remand. The Court hearing the prescription issue will now be a federal court, as opposed to the current state court system. Imagine the prescription issue being decided by Judge Feldman or another judge with his judicial philosophy. The cases against the Church pending in the Eastern District have been assigned to Mary Ann Lemon and Barry Ashe (formerly of Stone Pigman). If Judge Ashe was assigned the case and Stone Pigman appeared, he would be required to recuse himself. Inasmuch as the bankruptcy would be filed due to the victim claims the chances are slim that the cases removed to Federal Court will be remanded to State Court or that the United States District Judge will abstain sending the cases back to State Court. The bankruptcy court cannot hear jury trials and can only issue recommendations for a District Judge to render a judgment with respect to liability and quantum for the victim's claims.

A bankruptcy also gives the Church the ability to cut off claims if proofs of claim are not filed whether or not the claimants had actual knowledge of the bankruptcy filing. One of the first day motions that the Church will file will be a Motion to Fix a Bar Date. The Church will ask for authority to advertise the bar date in various papers. The effect of this can be far reaching. In connection with the Hunt Oil Chapter 11, the 5th Circuit held that publication notice in the Wall Street Journal was sufficient notice to cut off landowners in Cameron Parish from asserting environmental claims against Hunt Oil. Technical issues may also cause the loss of a claim, for example, if class proofs of claim are disallowed, if claims with unknown amounts are disallowed, or if a plaintiff's lawyer signs the proof of claim for his client. The bar date motion and the failure of claimants to file proofs of claim will act as a means for the Church to limit its liability under principles of *res judicata*. It will also be important for an organized group of plaintiffs to request that the Court enter an order allowing the names and addresses of the claimants to be kept confidential.

The Bankruptcy Code has a provision that allows, as does existing case law, for the entry of a channeling injunction. The bankruptcy code provision relating to a channeling injunction is

limited to asbestos cases, however, case law has expanded the use of a channeling injunction to other cases. The plan of reorganization filed by the Church in St. Paul / Minneapolis contained a channeling injunction and the Court held that the presence of a channeling injunction in a plan did not make the plan non-confirmable.

The two bankruptcy judges in New Orleans may also be favorable to the Church. Meredith Grabill, who was recently appointed to fill the seat held by Judge Magner, is or was a member of the Federalist Society and is very close to Judge Englehart in judicial and political philosophy. Judge Brown is a wild card but may not have the case assigned to him due to his age and potentially limited tenure on the bench. He is on his third round of recall. A possibility to consider is that the Church may file in Lafayette. Judge Kolwe is a former Jones Walker partner and worked with Patrick Vance. The only Catholic judge in Louisiana is Douglas Dodd in Baton Rouge and it is doubtful the Church will want him to handle the case.

A bankruptcy filing will limit the litigation costs of the Church. If each case filed were to come to trial, the cost to the Church would be staggering. The legal process alone would take (5) to ten (10) years for all cases to come to trial. A Chapter 11 with settlement grid reduces the legal costs and, more importantly, fixes the liability and funding requirement for the Church. A likely plan will create a settlement trust with a fixed amount funded by the Church. Once the fixed amount is funded how the money is split between the claimants is of no matter to the Church. Both the legal cost and risk as to liability and amount will be removed as issues facing the Church in the future if they can confirm a plan.

**RIGHTS OF PLAINTIFFS IN A CHAPTER 11**

In a Chapter 11, the United States Trustee appoints a creditors' committee from a group of creditors who fill out a questionnaire and indicate they are willing to serve as members. The committee usually has five (5) or seven (7) members and generally is comprised of the creditors possessing the largest claims. Pursuant to 28 U.S.C. § 101(5), the definition of a claim does not require that the claim of a creditor be liquidated or fixed as to liability or amount. I have looked at the records in all the Church related Chapter 11 proceedings and in each case the creditors' committee majority is made up of the victims of sexual abuse. The committee, when selected, has the ability to hire 1) counsel; and 2) other professionals (such as appraisers, actuaries, accountants and forensic accountants) to pursue the rights of the bankruptcy estate's creditors. The costs of counsel and other professionals hired by the committee will be paid for by the Church.

11 U.S.C. § 1103 outlines the duties of a creditors' committee as the following:

    a)     Consult with the debtor-in-possession concerning the administration of the case;

    b)  Investigate the acts, conduct, assets, liabilities and financial condition of the debtor;

    c)  Participate in the formulation of a Plan;

    d)  Request the appointment of a Trustee or Examiner; and

    e)  Perform such services as may be in the interests of justice.

  Bankruptcy Code 11 U.S.C. § 1104(c)(2) provides for the appointment of an Examiner if either a) the appointment is in the best interests of creditors; or b) the debtor's fixed liquidated unsecured debt exceeds $5,000,000.00.

  At first blush, it would seem that the appointment of an Examiner would benefit the abuse victims. The appointment is really a double edge sword since the conclusions reached in the Examiner's report, such as whether property is owned by the Church or whether a bequest is a specific bequest insulating the bequest from the claims of the sexual abuse victims, will not likely be overturned by the Bankruptcy Court. It would not be surprising for the Church to request the appointment of an Examiner so that the Church's financial information is shielded from the creditors committee, the sexual abuse victims and the public. Possibly, the only documents the creditors will see, if an Examiner is appointed, will be the Examiner's report.

  The creditors' committee, under certain circumstances, may possess standing to assert a claim in the name of a debtor. The Bankruptcy Code initially places all potential claims in the hands of a debtor (*See* 11 U.S.C. § 544). While a debtor and its counsel have a fiduciary duty to creditors, it is difficult to convince a debtor to file suit to avoid a transfer it voluntarily made or made in contemplation of the filing of a Chapter 11. In the *Louisiana World Exposition, Inc.* Chapter 11, the committee requested the authority to file suit against the officers and directors of *Louisiana World Exposition, Inc.* The 5th Circuit reversed the holding of the Bankruptcy Court and held that a creditors' committee may under certain conditions possess the requite standing (See *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir 1987). In order for the committee to pursue a claim on behalf of the debtor, the committee must make demand on the debtor and possess a "colorable claim." The determination as to standing is determined on an item by item basis. In the Milwaukee case, the committee won on one issue and lost on another. A similar result occurred in the Anchorage Chapter 11 case.

  A major issue will be exactly what assets comprise property of the Debtor Archdiocese. The Archdiocese will attempt to downplay the value while the creditors' committee will seek to increase the value. The importance of the valuation difference is that 11 U.S.C. § 1129(a)(7)(a)(2) requires that creditors receive under a plan that which they would receive if the debtor was liquidated under Chapter 7. The Church cannot confirm a plan without paying creditors the amount they would receive if its assets were liquidated. In the Portland Archdiocese case, the Church contended the value of its assets was $19,000,000.00 and the

creditors' committee asserted the value was $500,000,000.00. The recovery to abuse victim creditors will be based on the outcome of valuation litigation. The relationship of the Archdiocese to related entities and the transfer of funds between the entities will have to be investigated.

In other Church Chapter 11 proceedings issues have been litigated as to whether Church property was owned by the separate dioceses within the Archdiocese or whether a cemetery was a separate juridical entity and, therefore, its burial fund did not comprise property of the bankruptcy estate. The Church strategy has been to claim that significant assets are not property of the estate for purposes of paying creditors.

The other key number in determining whether the Church can confirm a plan is the universe of claims and the value of each claim. In the Asbestos Chapter 11 cases and Dow Corning cases, the claims universe and the potential claims universe were determined by actuaries. The average value of each claim was also the subject of expert testimony.

**PLAN THAT WILL BE FILED BY THE ARCHDIOCESE**

The Plan that will be filed by the Archdiocese will have the following elements:

a) A fixed pool for the payment of creditors. This number will fix the liability of the Church and will limit any risk they have as to the number of claims;

b) A channeling injunction that will force all claims through a process;

c) A removal of all cases from Civil District Court;

d) A release for all officers, directors, employees and priests;

e) An injunction against the filing of future claims and a dismissal of all claims of victims who did not file a proof of claim in accordance with the bar date. The Plan will contain a provision that claims not filed by the bar date will be barred by *res judicata* principles;

f) A waiver of all avoidance actions which includes claims relating to the Church's transfer of properties and rights under various self-created trusts and entities;

g) Limitation on legal fees recoverable by plaintiff lawyers from compensated victims; and

h) Some settlement with the Church's insurers to fix those entities' liability for a fixed contribution to the settlement fund.

{00371971-12}

**KEY CHAPTER 11 ISSUES**

I have addressed many Chapter 11 issues in other sections of this memo. The critical issues are the following:

a) What property comprises property of the estate and what is the liquidation value of such property;

b) How many claims exist (both asserted and unasserted) and what are the value of the claims;

c) Whether the Court can issue a channeling injunction;

d) The extent of the releases available in a Chapter 11. The 5th Circuit only allows limited injunctions and releases;

e) Rights against the insurance entities who insure the Church. Will they be covered by the Plan and have all claims against them released; and

f) Whether the Court should appoint an Examiner.

**PLANNING FOR A CHAPTER 11**

The normal delay in this circuit between the filing of a Chapter 11 and the appointment of a creditors' committee is usually two (2) to three (3) weeks. The delay works to the advantage of a debtor. In order to potentially avoid the time delay, the abuse victims should form an ad hoc committee and identify the abuse victims who will ultimately serve on the official committee. The ad hoc committee will likely be appointed as the official creditors committee if the ad hoc committee was fairly selected. To meet this hurdle, a meeting should be held with the lawyers presently representing clients and, out of that meeting, the members of the ad hoc committee should be selected.

The ad hoc committee could then retain counsel to be present at all hearings prior to the appointment of the official creditors' committee.

The bankruptcy case will have bankruptcy and non-bankruptcy issues. The committee's legal team should have a bankruptcy specialist and a person skilled in the creation of a claims process and means of determining the value of claims.

A website should be created to afford abuse victims and their counsel with real time information about the case. In addition, a fact sheet with frequently asked questions should be included on the website so that people can be educated about the Chapter 11.

Court records should be searched prior to any bankruptcy filing to see if the Church is embarking on a pre-filing protection plan. For example, have new entities been created to hold

Archdiocese assets, are the Parish churches separately incorporated, has the Church transferred or alienated any property?

A response to the Church's filing should be prepared to provide a counter-point to the narrative advanced by the Church as to its reason for filing.

A determination should be made as to what claims against the Church are automatically stayed by the filing and which defendants are not protected by the automatic stay so that those cases can move forward expeditiously.

| Name of Debtor | Date Filed | Court | Docket Number | Date Confirmed | Corporate Form of Debtor | Separately Incorporated Parishes? |
|---|---|---|---|---|---|---|
| Archdiocese of Portland | 7/6/2004 | D. Oregon | 3:04-bk-37154 | 4/17/2007 | Corporation Sole | No |
| Diocese of Tucson | 9/20/2004 | D. Arizona | 4:04-bk-04721 | 8/1/2005 | Corporation Sole | No |
| Diocese of Spokane | 12/6/2004 | E.D. Washington | 2:04-bk-08822 | 4/24/2007 | Corporation Sole | No |
| Diocese of Davenport | 10/10/2006 | S.D. Iowa | 3:06-bk-02229 | 5/1/2008 | Non-Profit Corp. | Yes |
| Diocese of San Diego | 2/27/2007 | S.D. California | 3:07-bk-00939 | Settled 11/16/2007 | Corporation Sole | No |
| Diocese of Fairbanks* | 3/1/2008 | D. Alaska | 4:08-bk-00110 | 2/17/2010 | Corporation Sole | No |
| Oregon Province, Society of Jesus | 2/17/2009 | D. Oregon | 3:09-bk-30938 | 7/29/2011 | Non-Profit Corp. | No** |
| Diocese of Wilmington | 10/18/2009 | D. Delaware | 1:09-bk-13560 | 7/28/2011 | Non-Profit Corp. | Yes |
| Archdiocese of Milwaukee | 1/4/2011 | E.D. Wisconsin | 2:11-bk-20059 | 11/13/2015 | Non-Profit Corp. | Yes |
| Christian Brothers of Ireland | 4/28/2011 | S.D. New York | 7:11-bk-22820 | 1/13/2014 | Non-Profit Corp. | Yes |
| Diocese of Gallup | 11/12/2013 | D. New Mexico | 1:13-bk-13676 | 6/23/2016 | Corporation Sole | No |
| Diocese of Stockton | 1/15/2014 | E.D. California | 2:14-bk-20371 | 1/13/2017 | Corporation Sole | Yes |
| Diocese of Helena | 1/31/2014 | D. Montana | 2:14-bk-60074 | 3/5/2015 | Corporation Sole | No |
| Archdiocese of St. Paul and Minneapolis | 1/16/2015 | D. Minnesota | 3:15-bk-30125 | 9/25/2018 | Religious Corp.*** | Yes |
| Diocese of Duluth | 12/7/2015 | D. Minnesota | 5:15-bk-50792 | Settled 03/07/2019 | Religious Corp.*** | Yes |
| Diocese of New Ulm | 3/3/2017 | D. Minnesota | 3:17-bk-30601 | Pending | Religious Corp.*** | Yes |
| Diocese of Great Falls- Billings | 3/31/2017 | D. Montana | 2:17-bk-60271 | 8/22/2018 | Corporation Sole | No |
| Crosier Fathers and Brothers | 6/1/2017 | D. Minnesota | 4:17-bk-41681 | 3/26/2018 | Non-Profit Corp. | Yes |
| Diocese of St. Cloud | 3/15/2018 | | | | | |
| Archdiocese of San Juan, PR | 8/30/2018 | | | | | |
| Diocese of Winona-Rochester | 11/30/2018 | | | | | |
| Archdiocese of Santa Fe | 11/30/2018 | Bankr. D.N.M. | 1:18-bk-13027 | | Corporation Sole | |
| Archdiocese of Agana, Guam | 1/16/2019 | | | | | |
| Diocese of Rochester, NY | 9/12/2019 | Bankr. D. | 2:19-bk-20905 | | Non-Profit Corp. | Yes |

| Name of Case | Type | Date Filed | Date Confirmed | Time Filing to Confirmation | Settlement Total | Insurance Portion | Total Prof'l Fees | Number of Victims | Settlement Per Victim | Column1 |
|---|---|---|---|---|---|---|---|---|---|---|
| Portland | Archdiocese | 7/6/2004 | 4/17/2007 | 2.78 Years | $74.40 | $52.00 | $19.10 | 173 | $430,000 | |
| Tucson | Diocese | 9/20/2004 | 8/1/2005 | 0.86 Years | $22.20 | $14.80 | $5.00 | 45 | $493,300 | |
| Spokane | Diocese | 12/6/2004 | 4/24/2007 | 2.38 Years | $48.00 | $20.00 | $10.90 | 150 | $320,000 | |
| Davenport | Diocese | 10/10/2006 | 5/1/2008 | 1.56 Years | $37.00 | $19.50 | $2.60 | 162 | $228,390 | |
| San Diego** | Diocese | 2/27/2007 | 11/16/2007 | 0.72 Years | $198.10 | $75.65 | $5.00 | 144 | $1,375,690 | |
| Fairbanks*** | Diocese | 3/1/2008 | 2/17/2010 | 1.97 Years | $9.80 | $1.40 | $4.80 | 290 | $33,790 | |
| Oregon Province Society of Jesus | Religious Order | 2/17/2009 | 7/29/2011 | 2.44 Years | $166.10 | $118.00 | $8.60 | 535 | $310,460 | |
| Wilmington | Diocese | 10/18/2009 | 7/28/2011 | 1.78 Years | $77.40 | $15.60 | $15.80 | 148 | $522,970 | |
| Milwaukee | Archdiocese | 1/4/2011 | 11/13/2015 | 4.86 Years | $21.00 | $10.70 | $23.00 | 350 | $60,000 | |
| Christian Bros. of Ireland | Religious Order | 4/28/2011 | 1/13/2014 | 2.72 Years | $16.50 | $3.50 | $8.10 | 400 | $41,000 | |
| Gallup | Diocese | 11/12/2013 | 6/23/2016 | 2.62 Years | $22.00 | $18.90 | $3.50 | 57 | $385,960 | |
| Stockton | Diocese | 1/15/2014 | 1/13/2017 | 3.00 Years | $17.10 | $3.30 | $1.00 | 30 | $570,000 | |
| Helena | Diocese | 1/31/2014 | 3/5/2015 | 1.09 Years | $21.00 | $14.40 | $2.00 | 360 | $58,000 | |
| St. Paul and Minneapolis | Archdiocese | 1/16/2015 | 9/25/2018 | 3.69 Years | $210.30 | $166.80 | $26.00 | 450 | $467,300 | |
| Great Falls-Billings | Diocese | 3/31/2017 | 8/22/2018 | 1.39 Years | $20.00 | $8.00 | $1.50 | 86 | $232,560 | |
| Crosier Fathers and Brothers | Religious Order | 6/1/2017 | 3/26/2018 | 0.82 Years | $25.50 | $19.80 | $1.10 | 43 | $593,020 | |
| Duluth | Diocese | 12/7/2015 | 3/7/2019 | 3.25 Years | $31.70 | $31.70 | $4.00 | 125 | $253,400 | |
| New Ulm | Diocese | 3/3/2017 | Pending | | | | | | | |
| St. Cloud | Diocese | 3/15/2018 | | | | | | | | |
| San Juan, PR | Archdiocese | 8/30/2018 | | | | | | | | |
| Winona-Rochester | Diocese | 11/30/2018 | | | | | | | | |
| Santa Fe | Archdiocese | 11/30/2019 | | | | | | | | |
| Agana, Guam | Archdiocese | 1/16/2019 | | | | | | | | |
| Rochester, NY | Diocese | 9/12/2019 | | | | | | | | |
| | | | | | $1,018.10 | $594.05 | $142.00 | 3,548 | 0.286950394588501 | AMOUNTS IN MILLIONS |