UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES DOE                                              CIVIL ACTION

VERSUS                                                 NUMBER: 20-1338

ARCHDIOCESE OF NEW ORLEANS                             SECTION: "J"(5)
INDEMNITY, INC., ET AL.

**ORDER AND REASONS**

Before the Court is Plaintiff's "Motion to Recuse Magistrate." (Rec. doc. 57). One of the Defendants, the Roman Catholic Church of the Archdiocese of New Orleans ("ANO"), filed a memorandum in opposition to the motion. (Rec. doc. 61). Plaintiff filed a reply memorandum (rec. doc. 64) and I held a hearing on the motion on August 11, 2021, after which I took the motion under advisement. (Rec. doc. 65). Having thoroughly considered the pleadings and exhibits, along with the argument of counsel at the hearing and facts known to me as the subject of the motion, I find that the motion should be and is hereby denied. Here are the reasons.

## I.    THE RELEVANT PROCEDURAL HISTORY

This case is one of scores of similar matters currently pending in this District. Like many of the others, it was removed by ANO following its declaration of bankruptcy. (Rec. doc. 1). In this case, Plaintiff, James Doe, has sued ANO; two of its insurers; and two individuals, Michael Fraser ("Fraser") and Paul Calamari ("Calamari"), alleging that Fraser and Calamari sexually abused him when he was a young boy and they were Roman Catholic priests and that said abuse was covered up by ANO. (Rec. doc. 1-1). Plaintiff's counsel in this case are also enrolled as counsel of record in more than 20 sexual-abuse cases in this District involving ANO, notably (for present purposes) including *J.W. Doe v. Roman Catholic Church*

*of the Archdiocese of New Orleans*, Civil Action No. 20-CV-1321 (hereinafter "*Hecker*"), to which I was randomly assigned as the presiding Magistrate Judge.

Both this case and the *Hecker* case were stayed by the respective presiding District Judges owing to the pending ANO bankruptcy proceedings.  In the bankruptcy case, Plaintiff's counsel moved for a limited lift-stay order that would be applicable <u>in both cases</u> to take the depositions of Hecker and Calamari because of their advanced age.  (Rec. doc. 18 in *Hecker*). Specifically, Plaintiff's counsel indicated a desire to "propound limited written discovery on and depose the Non-Debtor Defendant Priests due to their advanced age and a fear that those priests may pass away prior to the resolution of the Archdiocese's bankruptcy case."  (Rec. doc. 18-2 p. 13 in *Hecker*).  The Bankruptcy Judge agreed, but noted that it "does not exercise jurisdiction over the State Court Actions, as they are currently pending in the District Court; therefore, the task of staging discovery in those cases in such a way that will permit the movants to depose the Non-Debtor Defendant Priests—without impairing the interests of the Debtor—rests with the District Court judges assigned to the State Court Actions."  (*Id.* at 13-14).  The "Non-Debtor Defendant Priests" referenced in that order were Hecker and Calamari – defendants in two <u>different</u> cases pending in this District Court.

The matter of deposition scope and limits then – predictably – moved to the District Court.  The *Hecker* matter, which was removed before this one and is therefore the "earlier filed" of the two cases, was randomly assigned to me.  The present matter, filed later, was assigned to a different Magistrate Judge.  Recognizing that management of the discovery allowed for by the Bankruptcy Judge as to Hecker and Calamari would be best managed by a single Magistrate Judge, the presiding District Judge in this later-filed case re-assigned this case to me, the assigned Magistrate Judge in the earlier-filed matter.  (Rec. doc. 44).

Following that reassignment (and without objection by any party or its counsel), I held several status/discovery conferences with counsel in the two combined cases, primarily to discuss the parameters of the Hecker and Calamari depositions.  (Rec. docs. 46, 48, 49). Overruling certain objections of ANO, I issued a minute entry ordering the following:

- The depositions would go forward with no limitations on the scope of questioning of Mr. Hecker and Mr. Calamari, without prejudice to the Debtor's right to move to exclude such testimony from use in any future proceedings.

- The transcripts of those depositions would initially be sealed as a prophylactic measure.

- A protective order akin to the one in place in 20-CV-1321 was to be submitted to the Court for its approval and use in 20-CV-1338 (this case).

- I also made my courtroom available for the deposition to make myself immediately available if and when issues arose in the deposition.

(Rec. doc. 48; rec. doc. 24 in *Hecker*).

The Hecker deposition went forward (but not in my courtroom) on December 14 and 15, 2020.  Almost immediately thereafter, Plaintiffs' counsel filed their motion to unseal the transcript and all of the documents introduced in the deposition.  (Rec. doc. 29 in *Hecker*).[1] With typical flair, counsel announced that this motion to unseal a deposition was "one of the most consequential pleadings all three undersigned counsel ever have filed, and it is expected that it might be for the Court as well."  (*Id.*).  In that motion, Plaintiffs' counsel complained – quite correctly – that the deposition suffered from "major complications" due

---

[1] Some 1,500-plus pages of documents were attached as two exhibits during the deposition.  (Rec. doc. 29-4 at 13-14 (SEALED) in *Hecker*).  Counsel questioned the deponent on only a tiny fraction of them.  (Rec. doc. 58 (SEALED) in *Hecker*).

3

to Hecker's refusal to answer questions directly, his sporadic invocations of his Fifth Amendment privilege, his counsel's loquacious attempts to restrain and redirect Hecker and the arguments between them that ensued, and ANO's counsel's obstructive and unnecessary form and speaking objections.  (*Id.*).

I largely agreed with Plaintiff's counsel that these complaints had merit, but I denied the motion to unseal "at this time."  (Rec. doc. 57 in *Hecker*).  I reasoned that Plaintiff's counsel's method of questioning Hecker (while permitted according to my earlier order on scope) resulted in a transcript in which "questions and testimony germane to the claims against Hecker and the Archdiocese are so intertwined that they are insusceptible of meaningful disentanglement, which, in the case of a motion to unseal, <u>would be necessary in light of the limited lift-stay order issued by the Bankruptcy Judge.</u>"  (*Id.* (emphasis added)).[2] As for the exhibits to the deposition that counsel wanted unsealed, I ruled that:

> unsealing the vast majority of those would violate the automatic stay and the limited lift-stay order issued by the Bankruptcy Court.  Plaintiff's counsel attached two tranches of documents as Exhibits 1 and 2 to the Hecker deposition, comprising some 1,500-plus pages, only a fraction of which were used to question the deponent.  All of these documents, including state-court motion papers not made exhibits to the subject deposition, were subject to pending motions at the time the automatic stay took effect.  The Court will not permit those documents (and Plaintiff's efforts to unseal them) to be bootstrapped into this limited federal litigation at this early stage of the proceedings in the Bankruptcy Court.
>
> (*Id.*).

I denied the motion to unseal.  That denial was not appealed by Plaintiff.

---

[2]  That Order had explicitly stated:  "the task of staging discovery in those cases in such a way that will permit the movants to depose the Non-Debtor Defendant Priests—<u>without impairing the interests of the Debtor</u>— rests with the District Court judges assigned to the State Court Actions."  (Rec. doc. 18-2 pp. 13-14 in *Hecker*)(emphasis added).

Things remained quiet in both cases, until recently.

On July 15, 2021, Plaintiff's counsel filed an altogether unusual pleading, styled "Motion for Limited Stay Relief." (Rec. doc. 51). The styling wasn't unusual, but the content surely was. In that motion –filed, notably, before the District Judge – counsel first requested that the District Judge lift the bankruptcy stay in order that they be allowed to depose Calamari. (*Id.*). That request was only slightly strange, given that the Bankruptcy Court had already explicitly granted that relief and I had already issued an order on the scope of the Calamari deposition. It was counsel's second request that stood out as unusual.

Suggesting to the District Judge that the impartiality of the Magistrate Judge (me) "appears compromised," counsel attached <u>as an exhibit</u> to the Motion for Limited Stay Relief a "Motion to Recuse Magistrate" and asked the District Judge to set that exhibit for "oral argument with an evidentiary hearing." (Rec. doc. 51-1 at 4).

I know what a motion to recuse is (I even filed one once as a practicing attorney). But what I don't know is how one sets an exhibit for oral argument, with an evidentiary hearing no less. Seeking to gain some clarity on just what it was that Plaintiffs' counsel was trying to accomplish, I set a status conference with all the parties' counsel to discuss the matter.

At that conference, I observed what I thought should have been well-understood by all – that under 28 U.S.C. §455, a motion to recuse a judge must be filed before <u>that</u> judge. When Plaintiff's counsel, Mr. Gisleson, cavalierly suggested that he didn't care what judge heard the motion, I explained that attorneys don't have a choice in the matter – there is only one procedurally proper way to do it. If counsel wanted me to recuse myself from this matter, I explained, I would find myself in the unusual position of ordering them to file their

motion to recuse me before me – which I did immediately after the conference.  (Rec. doc. 56).[3]  The present motion followed.

## II.      The Motion to Recuse

In his motion to recuse, Plaintiff states that my recusal is "mandatory" pursuant to 28 U.S.C §455(a), (b)(1), (b)(4), and (b)(5) for the following reasons:  (1) that my wife "was an employee and/or consultant of the Archdiocese for more than twenty years at the highest levels -- implementing a strategic plan for the entire Archdiocese over 5-10 years, overseeing the restructuring of 72 elementary schools, and developing 13 housing properties totaling 1,200 rental units"; (2) that she "continues to perform work for Archdiocese Apostolates"; (3) that she has "developed at least seven projects for Archdiocese Apostolates costing in the tens of millions"; (4) that her company's offices were purchased from the Archdiocese and the land they sit on is leased from the Archdiocese; (5) that the Archdiocese loaned her company at least $650,000 for a development project; (6) that she has signed numerous land transfers, leases, and financial instruments with the Archdiocese or one of its Apostolates; (7) that she currently serves on the board of directors of an Archdiocese Apostolate; and (8) that "the finances between the Magistrate's spouse's company and the Archdiocese are inextricably intertwined."  (Rec. doc. 57-1).

Before delving into these arguments to demonstrate just how wrong Plaintiff and his counsel are about most of what they allege, it is worth noting (again) that, when they originally filed this "motion" as an exhibit to another motion before a <u>different</u> judge, counsel asked that judge for oral argument <u>and</u> an evidentiary hearing.  I am not sure if they honestly believed that an evidentiary hearing was called for (because they still have not offered any

---

[3]  Indeed, Judge Barbier denied the motion as moot for that very reason.  (Rec. doc. 60).

actual legal authority for such a request – even when asked directly to do so), or if, rather, they calculated that if and when they were confronted with the inaccuracy of many of the factual misstatements they have made, they could invoke the "that's why we asked for an evidentiary hearing" defense, which Mr. Gisleson actually did during the hearing.

In any event, what follows is an explanation why so many of these supposed "facts" are wrong, why others are irrelevant and why, in the final analysis, my recusal is most definitely not required in this matter.  But first, the law.

### A.   The Relevant Law on Recusal

At the hearing, I confirmed with counsel that they sought my recusal on three legal bases:  First, because "I, through my wife, have a financial interest [or any other interest] in the subject matter of the controversy that could be substantially affected by the outcome of the case," pursuant to §455 (b)(4).  (Rec. doc. 67 p. 5).  Second, "that I have a personal bias in favor or against some party in the case" pursuant to §455(b)(1).  (*Id.*).  Third, that "the alleged interests of my wife that are described in [Plaintiff's] papers could cause my impartiality to reasonably be questioned" pursuant to §455(a).  (*Id.*).

I note here what I noted at the hearing – that aside from bits of the relevant statutory language and some boilerplate language on recusal – Plaintiff cited no case law to support his various arguments.  In fact, he left out clearly applicable statutory language that he should have included.  Before addressing that omission, and because what little case law counsel did cite is in fact actually accurate and at least partially fits the description heading this section, "Relevant Law on Recusal," here is the full extent of the case law cited in support of Plaintiff's motion:

> [t]he test to determine whether a judge should be recused is
> whether a "reasonable person, with knowledge of all the facts,

would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Intern. Ltd.*, 368 F.3d 289, 301 (3rd Cir. 2004). A court making the decision must consider how the facts would appear to a "well-informed, thoughtful, and objective observer, rather than the hypersensitive, cynical, and suspicious person." *U.S. v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995); *see also Bryce v. Episcopal Church in the Diocese of Col.*, 289 F.3d 648, 659 (10th Cir. 2002) ("The test is whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)). . . . Typically, personal bias [under 455(b)(1) needs to be shown to be directed at a party and extrajudicial. *Nickerson-Malpher v. Baldacci*, 522 F.Supp.2d 293, 296 (D. Me. 2007).

(Rec. doc. 57-1 pp. 13-14).

Again, this is the <u>entirety</u> of the authority presented by counsel in support of Plaintiff's motion. As we will see, they missed an awful lot.

I begin by adding the following observations regarding a judge's duty when faced with a recusal motion. "The issue of recusal requires a sensitive weighing of the circumstances in each case and is committed to the sound discretion of the district judge." *In re Placid Oil Co.*, 802 F.2d 783, 786–87, *reh'g denied*, 805 F.2d 1030 (5th Cir. 1986) (citing *In re City of Houston*, 745 F.2d 925, 927 (5th Cir. 1984)). This is because "[t]he judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2nd Cir. 1988), *cert. denied sub nom.* 490 U.S. 1102, 109 S.Ct. 2458 (1989).

Faced with a motion to recuse, a "judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Id.* Under this balancing test, "[a] judge is as much obliged not to recuse himself" unnecessarily as he is obliged to recuse himself when necessary. *Id.*

8

In a case such as this, where all of the bases for recusal flow from the alleged interests of the judge's spouse, that judge can rely on his preexisting knowledge of those interests in weighing all the circumstances and may even discharge his duty to "inform himself" by simply asking his spouse to confirm or refute the movant's factual claims.  *See U.S. v. Morrison*, 153 F.3d 34, 48 n. 4 (2nd Cir. 1998)("it was not irregular for Judge Wood to ascertain her husband's and friend's possible involvement with the defendant simply by asking them, in a reasonable effort to confirm that Morrison's incredible claims were indeed not factual.").[4] In this vein, then-Judge Breyer of the First Circuit observed:

> when considering disqualification, the district court is <u>not</u> to use the standard of "Caesar's wife," the standard of mere suspicion. That is because the disqualification decision must reflect <u>not only</u> the need to secure public confidence through proceedings that appear impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.
>
> *In re Allied-Signal, Inc.*, 891 F.2d 967, 970 (1st Cir. 1989)(Breyer, J.)(emphasis in original; citation omitted),[5] *cert. denied sub nom.* 495 U.S. 957, 110 S.Ct. 2561 (1990).

Moving on now to the specific grounds cited by Plaintiff in his motion, it makes sense to begin at the beginning of the statute.  Section 455(a) provides simply that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in

---

[4] *See also* 28 U.S.C. § 455(c) ("A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse...."); *Williams v. Balcor Pension Investors*, No. 90-CV-0726, 1990 WL 205805 at *8, nn. 7 & 9 (N.D. Ill. Nov. 28, 1990) (Rovner, J.) ("The Court has discussed this matter with her husband, and confirmed that his pension fund has not purchased any interest in any of the Mortgage Funds at issue in this case....").

[5] The *Allied-Signal* Court actually went on to find that it was not appropriate to disqualify a presiding judge on the ground that two of the judge's law clerks had brothers who represented plaintiff during the litigation.  The "Caesar's wife" standard refers to the story of Caesar dismissing his wife, Pompeia, for having supposedly been the object of an amorous house-breaking committed by Clodius, even though Caesar refused to offer evidence against Clodius when he was summoned to do so as a witness.  Caesar dealt with the paradox by saying, "I wish my wife to be not so much as suspected." *See* Plutarch, The Lives of the Noble Grecians and Romans 860.

which his impartiality might reasonably be questioned."  28 U.S.C. §455(a).  The Supreme

Court, in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860–61, 108 S.Ct. 2194,

2203 (1988), described this standard as an objective one – whether a reasonable and

objective person, knowing all of the facts, would harbor doubts concerning the judge's

impartiality.  *Id.*  "[I]t is critically important in a case of this kind to identify the facts that

might reasonably cause an objective observer to question [a judge's] impartiality." *Id.*, 486

U.S. at 865, 108 S.Ct. at 2205.

It is equally critical to understand that a court making the decision must consider how

the facts would appear to a "well-informed, thoughtful, and objective observer, rather than

the hypersensitive, cynical, and suspicious person." *U.S. v. Jordan*, 49 F.3d at 152, 156 (5th Cir.

1995).  "[E]ach §455(a) case is extremely fact intensive and fact bound, and must be judged

on its unique facts and circumstances more than by comparison to situations considered in

prior jurisprudence."  *Id.* at 157.

There are various sorts of "interests" that a judge or his spouse might have in a party

or in the subject matter of a case that "could be substantially affected by the outcome of the

proceeding" such that recusal is necessary.  One such interest is a "financial interest," which

Plaintiff in this case claims is one reason I should recuse myself from this matter.  As noted

earlier, though, while making this claim, counsel declined to cite the express language of the

statute defining the term, "financial interest."  I will fill that gap here: [6]

> "financial interest" means ownership of a legal or equitable
> interest, however small, or a relationship as director, adviser,
> or other active participant in the affairs of a party. . . .

---

[6]  Mr. Gisleson actually admitted at the hearing that he was aware of statutory provisions <u>and</u> case law that
supported his arguments, but he and his co-counsel inexplicably did not cite any of that authority.  (Rec. doc.
67 at 6-8).  Gisleson claimed at the hearing that he had "cited the subsection" of 28 U.S.C. § 455 that defined
"financial interest."  *(Id.* 6).  In fact, he did not.

28 U.S.C. § 455(d)(4).

Courts have said of both the "financial" and "other" interest described in the statute that the term "'interest'" means an investment or other asset whose value depends on the outcome, or some other <u>concrete financial effect</u> (such as how much property tax a judge pays). *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008)(emphasis added) (citing *In re Virginia Electric & Power Co.*, 539 F.2d 357, 366–67 (4th Cir. 1976)); *see also In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980) (possible potential benefit to presiding judge of lower utility bills based on outcome of case was "too insubstantial to require recusal."). "To establish a 'financial interest' in the subject matter in controversy, the effect of a favorable ruling must be direct rather than indirect, speculative or slight." *McCann v. Communications Design Corp.*, 775 F. Supp. 1535, 1541 (D. Conn. 1991) (citing *In re Placid Oil Co.*, 802 F.2d at 786–87).

Stated otherwise, "'where an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality.'" *Morrison*, 153 F.3d at 48 (citing *United States v. El–Gabrowny*, 844 F.Supp. 955, 961 (S.D. N.Y. 1994) (quoting *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2nd Cir. 1988)).

Notably for present purposes, many cases make clear that only such a direct interest <u>in a party</u> will justify recusal. As we will see below, that is particularly important in this case because the only "interests" (financial or otherwise) that Plaintiff claim my wife or I have that are germane to this case are interests in non-parties, some related to ANO and some clearly not.

11

In *Harris v. Board of Sup'rs of Louisiana State Univ.*,[7] Plaintiff argued that the presiding judge should have recused himself because: (1) he was an alumnus of Defendant, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU") and (2) he was a "trustee" of LSU. *Id.* The Fifth Circuit quickly dispatched the first argument: "[b]eing an alumnus of a university does not preclude a judge from presiding over a case involving that university under § 455(a)." *Id.* at 727. The Court then noted that if in fact the judge was a "trustee" of Defendant, LSU, his recusal would be required under § 455(a). *Id.* But according to an affidavit submitted by the defendant, the judge was not, in fact, a "trustee" of LSU but was rather a "member" of the LSU <u>Law Center</u> Alumni Board of Trustees. Taking judicial notice of this fact, the Court wrote "The LSU Law Center is not a party, and Harris has not provided any information with respect to this affiliation. Harris has not 'show[n] that, if a reasonable man knew of all the circumstances, he would harbor doubts about the judge's impartiality.'" *Id.* (citing *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 38 F.3d 1404, 1408 (5th Cir. 1994)).

Other courts have ruled similarly. *See, e.g.*, *Maurey v. Univ. of So. Cal.*, 12 Fed.Appx. 529, 532 (9th Cir. 2001), *cert. denied*, 535 U.S. 929, 122 S.Ct. 1301 (2002) (upholding denial of recusal motion in an employment case involving USC's School of Urban and Regional Planning even though judge served on the Board of Councilors at USC Law School); *Szeinbach v. Ohio State Univ.*, No. 08-CV-0822, 2015 WL 12991136 (S.D. Ohio Jul. 8, 2015) (denying recusal motion in an employment case against university when judge served as an adjunct professor at law school and plaintiff previously worked at the college of pharmacy); *see also Nachshin v. AOL, LLC*, 663 F.3d 1034, 1041-42 (9th Cir. 2011) (finding that a related, unnamed

---

[7] 409 Fed.Appx. 725 (5th Cir. 2010).

party to the proceeding "was not a 'party' to the proceeding" and that the plaintiff failed "to cite precedent supporting the proposition that someone or something fortuitously impacted by a proceeding should be treated as a 'party' to the proceeding under § 455(b)").

With this authority in mind, we turn now to separating fact from fiction to determine what true facts the objective, reasonable person should be considering in the recusal context.

### B.   An Evidentiary Hearing Is Unwarranted

In brief, counsel suggested that an evidentiary hearing was necessary.  At the hearing, Mr. Gisleson elucidated:  "[i]f Your Honor is going to be up there and challenge facts that we have in our motion, I'm going to maintain we're entitled to an evidentiary hearing."  (Rec. doc. 76 at 15).  In response, and because counsel cited no authority in brief to support their request for an evidentiary hearing, I asked him the following question:

> [w]here's the basis in the law for that as opposed to me doing a reasonable investigation of the allegations that you've made and whether there's a basis for me under Section 455 to recuse myself? That's the standard. Give me some authority for why I need to have an evidentiary hearing.
>
> (*Id.*).

I was provided no substantive citation to any authority by Mr. Gisleson, save the vague suggestion that my "internal equitable powers allow for" a hearing.  (*Id.* at 15-16).  I will exercise those powers and my discretion to decline Plaintiff's request for a hearing.

In general, a court considering a recusal motion under 28 U.S.C. §144 or 28 U.S.C. §455 can rule summarily without conducting factfinding proceedings or assuming the truth of a litigant's contentions.  *See ClearOne Communications, Inc. v. Bowers*, 643 F.3d 735, 777 (10th Cir. 2011); *Skolnick v. Doria*, 103 F.3d 133 (7th Cir. 1996) (table).  "[I]t was not irregular for [the judge] to ascertain her husband's and friend's possible involvement with the defendant simply by asking them, in a reasonable effort to confirm that [defendant's] incredible claims

were indeed not factual." *Morrison*, 153 F.3d at 48 n. 4; *see also Williams v. Balcor Pension Investors*, No. 90-CV-0726, 1990 WL 205805 at *8 nn. 7 & 9 (N.D. Ill. Nov. 28, 1990) (Rovner, J.) ("The Court has discussed this matter with her husband, and confirmed that his pension fund has not purchased any interest in any of the Mortgage Funds at issue in this case....).

The Court has conducted its own investigation of what Plaintiff's counsel wrongly describes as the "facts that we have in our motion" and I have assessed the true facts relevant to that motion and I have determined that an evidentiary hearing is unwarranted.[8]  Likewise, and for the reasons that follow, recusal is also unwarranted.

<u>C.   *The True Facts*</u>

Here are the salient facts regarding my wife's work history – with and without the Archdiocese and/or any its affiliates.

She graduated from college in 1988 and went to work in banking, a business she remained in for 10 years.  She conducted no business with ANO or its Apostolates as a banker. In 1998 she went to work with Willwoods Community, a Catholic non-profit organization that, at the time, owned a public television station, several affordable housing complexes, a property management company, and two assisted living facilities.  Notably, while that organization is widely considered to be a Catholic one, it is not part of ANO nor is it an Apostolate.

Beginning in 2002 and lasting until early 2007, my wife worked as an independent consultant for ANO, working in part to help develop what was intended to be the

---

[8]  It is worth recalling here that counsel's original intent was to have <u>another</u> judge convene a hearing to delve into my wife's alleged interests in the outcome of this litigation, all on a  sort of "we don't know what we don't know so we need a hearing" basis.  Properly filed before me, the record here is demonstrably insufficient to obtain the recusal he desires.

Archdiocese's "strategic plan," which was partly described in Plaintiff's papers.  One thing that Plaintiff got wrong, however, was that the plan was never actually implemented due to complications arising from Hurricane Katrina.

There are two important facts here.  First, she was never an employee of ANO, merely a consultant.  Second, and most importantly, that working relationship ended more than 13 years ago.  Plaintiff's counsel do not grasp (or choose to ignore) this fact and what it means.

Since 2007, my wife has been employed by Providence Community Housing ("PCH"), a non-profit corporation whose mission is the development of affordable homes for those who need them in the Greater New Orleans area.  PCH is neither part of nor affiliated with ANO or any Apostolate. It receives zero income from ANO or any Apostolate.[9]

Some – but not all – of the housing that PCH has developed during its existence has involved purchasing and then redeveloping property formerly owned by ANO or one of its Apostolates, such as shuttered schools and churches, as well as existing senior residential facilities.   In turn, some of these properties are then managed by Christopher Homes, Incorporated ("CHI") (which is an Apostolate of ANO) for PCH as owner of the redeveloped properties.  In its life span, PCH has developed over $300 million in affordable housing in Greater New Orleans; less than a third of that amount even tangentially involved ANO or any of its Apostolates.[10]

Plaintiff's counsel apparently sees something nefarious in these straightforward business relationships and seem intent on contorting them into something they clearly are

---

[9] PCH was begun in 2006 using, in part, seed money from Catholic Charities (an Apostolate) that derived from donations to that organization earmarked for hurricane recovery efforts. Since that infusion, PCH has not received a dollar from ANO or any of its Apostolates.

[10] Consistent with my legal duty to inform myself of potential disqualifying grounds, I sought and obtained these facts from public records and my wife who, as CEO and President of PCH, knows these facts.  *See Morrison*, 153 F.3d at 48 n. 4; *Williams*, 1990 WL 205805 at *8 nn. 7 & 9.

not.  Either intentionally or by gross misunderstanding, they conflate the notions of working <u>for</u> someone versus working collaboratively <u>with</u> them.  But there is a very real difference – especially in the recusal context – between the two.  I tried to explain that difference at the hearing, to no avail.[11]

Neither PCH nor my wife work <u>for</u> the Archdiocese or any of its Apostolates; they do, however, work <u>with</u> one or the other on various projects.  There is no suggestion – and certainly no authority cited by Plaintiff to support any such suggestion – that a cooperative business relationship between the employer of the judge's wife and a non-party Apostolate could implicate a duty to recuse, which is why, no doubt, Plaintiff's counsel chose to grossly mischaracterize these facts into their own self-described "stunning" narrative to try to make their case for recusal.  As will become evident, that narrative is largely a creation of counsel's imaginations.

### D.   *Plaintiff's False Narrative*

"Narrative" can be an interesting word.  One definition of that word found in Merriam-Webster is "something that is narrated : story, account."  A second definition – certainly more apropos here – is "a way of presenting or understanding a situation or series of events that reflects and promotes a particular point of view or set of values."  That's exactly the sort of "narrative" Plaintiff's counsel have crafted here.

When I asked Mr. Gisleson at the hearing to describe the narrative fashioned by him and his co-counsel, he described it as one "of bias."  (Rec. doc. 67 at 17-18).  When I look at

---

[11] Counsel's failure to grasp this distinction is evident in their clinging to the mistaken assumption that, because PCH has worked <u>with</u> CHI on a number of projects, my wife must have been paid by either CHI or ANO.  That is simply not true and counsel can point to nothing – other than their mistaken assumption – to suggest that it might be.

the number of things counsel simply got wrong in their motion, it is apparent to me that they

began at the end – with the assumption of bias – then looked for (or created) "facts" to fit

into a narrative that would support that assumption.  Here I will discuss just some of what

they got wrong.

Before embarking on this discussion, however, certain language in the Fifth Circuit's

decision in *Travelers v. Liljeberg* comes to mind as particularly germane.  In criticizing what

it called a "lengthy, unsworn, and extremely intemperate (if not contemptuous) recitation of

'facts' in support of . . . 60(b)(6) motions [that boiled] down primarily to assailing the judge's

social contacts," the Fifth Circuit observed that "most of these 'facts' fall in the category of

intemperate accusations, inapposite references, and innuendos."  *Travelers*, 38 F.3d at 1409

at n. 5.  While the specific innuendos and false statements in that case and this one are

different to be sure, the above-quoted language can be used to describe both.

Here are the more remarkable examples in this case:

- **"[T]he Magistrate's spouse, Terri North, was an employee and/or consultant of the Archdiocese for more than twenty years at the highest levels."** (Rec. doc. 57-1 at 1).

    o This is not true.  My wife has never been an employee of the Archdiocese.  She was a consultant (and was paid as such) for five years (not 20), from 2002-2007.  She has not received any payment of any sort for any reason since ending that consultancy over 13 years ago.

    o It became clear at the hearing that Plaintiff and his counsel are largely hanging their proverbial hat on an isolated quotation they found in a publication of NeighborWorks, a nationwide network of community organizations (like PCH)

that provide affordable housing opportunities in their respective communities.  Providence has been a chartered NeighborWorks member since 2011.  NeighborWorks is <u>not</u> an Apostolate or otherwise affiliated with ANO.

As part of their narrative-crafting exercise, counsel located a quote attributed to my wife from a NeighborWorks America newsletter entitled "Community Conversations with Terri North" in which she is quoted, "[h]oning in on those skills during my 20-year tenure with the Archdiocese of New Orleans has solidified my expertise in affordable housing real estate development."  (Rec. doc. 57-2).  They have latched onto the phrase "20-year tenure with the Archdiocese" as the apparent linchpin of their argument, which is that my wife spent 20 years "working for" the Archdiocese, which is simply not true.

As I explained to counsel at the hearing, these words were written by an employee of PCH in response to written questions from NeighborWorks America – the "conversation" was a written question and answer exchange.  To the extent one reads the phrase "20-year tenure with the Archdiocese" to imply an employment/consultant/income-producing tenure, that would be wrong.  I can certainly understand how a person could draw that conclusion from those few words, standing alone and without any understanding of my wife's actual career path.  But that person would be mistaken.

My wife has not had a 20-year tenure with ANO in the way counsel categorically states she has.  We had this discussion at the hearing and it is clear that counsel don't see (or simply choose to ignore) the distinction

between working <u>for</u> a company or organization and working <u>with</u> that company or organization.

The distinction is straightforward:  As a consultant from 2002 until 2007, my wife worked <u>for</u> the Archdiocese and got paid for that work.  Since ending that consultancy and beginning her employment with PCH, she and that company have worked <u>with</u> the Archdiocese (and others) on projects involving the conversion of former ANO properties into affordable housing.  To be clear, the Archdiocese of New Orleans has never paid PCH a penny.[12]  There are no facts in this record to suggest that she or PCH have any other concrete interest in a party or in the outcome of this litigation

- "**[T]he Magistrate's spouse continues to perform work for Archdiocese Apostolates.**  (*Id.*).

  o  This is not true.  My wife is employed by Providence Community Housing, a non-profit organization that is wholly unaffiliated with the Archdiocese and is categorically not an "Apostolate" of ANO.[13]  While PCH has, over the course of its history, worked <u>with</u> certain Apostolates, as I I have already discussed, this does not equate with working <u>for</u> them.

  o  To the extent this statement is a reference to the fact that my wife sits on the Board of Directors for a different Apostolate, Notre Dame Health System, it

---

[12]  In fact, with the exception of the initial seed money contributed by Catholic Charities, which came 15 years ago from donations earmarked for Katrina recovery, PCH has not received any funds from any ANO Apostolate, including Christopher Homes, an entity that also features prominently in Plaintiff's brief.

[13]  Apostolates are a "group of church parishes, schools, nursing homes, senior living facilities, and other community, service agencies and facilities" affiliated with the Archdiocese.  *See* Verified Statement of the Apostolates Under Bankruptcy Rule 2019, at 1 (05/04/20), No. 20-10846 (Bankr. E.D. La.) (Rec. doc. 40). Apostolates are separately incorporated legal entities that possess their own employees, articles of incorporations, EIN numbers, and bank accounts separate from the Archdiocese. *Id.*

mischaracterizes her role on that board.  She serves as an unpaid volunteer on that board and Notre Dame Health System has no conceivable relationship to this litigation.

- **"[T]he finances between the Magistrate's spouse's company and the Archdiocese are inextricably intertwined.** (*Id.*).

    o This is categorically false and Plaintiff has presented <u>no</u> actual evidence or other support to suggest otherwise.  In fact, it is impossible to do so, because neither my wife nor her employer receives any compensation or funds from the Archdiocese.

- **"The Archdiocese Directly or Through Its Apostolates Has Served as the Benefactor of the Magistrate's spouse's career for more than 30 years."** (*Id.*).

    o This is both false and offensive.  While my wife was paid for five years, ending in 2007, as a consultant for ANO, she earned what she was paid – she did not rely on ANO or anyone else as a "benefactor."  And, again, that role ended <u>13 years ago</u>.

- **"Her career depends on the Archdiocese – as does her income."** (*Id.* at 2).

    o This statement is false.  Neither my wife nor her employer receives any financial support from ANO.

- **"The Magistrate's Spouse's Entire Career Has Been Economically Dependent on the Archdiocese and its Apostolates."** (*Id.* at 3).

    o This statement is, again, categorically false.  The first 10 years of my wife's professional career were spent in banking, with no connection to ANO whatsoever.  In the ensuing 20 years, she worked and was paid as a consultant

to ANO for five years.  The past 13 years of her career have been spent at PCH, where neither she nor her employer are "economically dependent" upon ANO or any Apostolate.

- **"While the total amount of financial benefit to Providence and the Magistrate's spouse [from ANO] is unclear, the substantialness of the projects, individually and cumulatively, cannot be overstated."** (*Id.* at 7).

  - o  Yet overstate is exactly what counsel does throughout their brief.  There is <u>no</u> direct financial benefit from or interest in ANO or any Apostolate on the part of my wife or her employer.

- **"Providence also received a $950,000 development fee through its for-profit company Lafitte 2017, LLC."** (*Id.* at 7).

  - o  This statement is both incorrect and completely irrelevant to any recusal analysis, as Lafitte 2017 is not affiliated with ANO or any Apostolate.

- **In addition to her salary from PCH, "she also received another $3,683 from 'related organizations.'"** (*Id.* at 10).

  - o  This statement is false and is the result of counsel's misreading of PCH's 2019 IRS Form 990, which is part of record document 57-2 and states that my wife received $3,683 in estimated "other compensation from the organization [PCH] and related organizations."  That "other compensation" was received from PCH – <u>not</u> a related organization – but it wouldn't fit Plaintiff's "narrative" to consider that possibility, so counsel apparently didn't.

- **"For 30 years, the Magistrate has financially benefitted from his spouse's work for the Archdiocese and the Archdiocese's Apostolates and continues to do so.**

**Her career, her accomplishments, and her income depend on the Archdiocese and its Apostolates."**  (*Id.* at 14) (emphasis added).

- o This is a collection is patently false and offensive statements.  I understand that the stakes in this case may be high for the parties and their counsel, but that's no excuse for such experienced lawyers to demean the judge's wife's career and accomplishments on the basis of a demonstrably false narrative.

### III.    CONCLUSION

> I know that most men, including those at ease with problems of the greatest complexity, can seldom accept even the simplest and most obvious truth if it be such as would oblige them to admit the falsity of conclusions which they have delighted in explaining to colleagues, which they have proudly taught to others, and which they have woven, thread by thread, into the fabric of their lives.
>
> Leo Tolstoy, "What is Art?"
> Ch. 14, 1897.[14]

I am sensitive to perceptions about fairness – even subjective ones– of litigants and counsel appearing before the Court.  But I must also be cognizant of my <u>duty</u> to sit when no valid basis for recusal has been shown.  It would be easy enough to simply bow to Plaintiff's request and recuse, but that would violate my duty to sit.  I can not and will not reward this misguided motion practice by acceding to Plaintiff's request, even if it might present the path of least resistance for me (and my wife) personally.

And, to be clear, the very kindest possible description of Plaintiff's perceptions that is merited here is "subjective."  I do not subscribe to that kind description.  Rather, I conclude

---

[14]  A similar, if more folksy, quote is often mis-attributed to Mark Twain:  "It ain't what you don't know that gets you in trouble.  It's what you know for sure that just ain't so."

that counsel have intentionally concocted a narrative based on false statements, innuendo, and speculation in an attempt to change magistrate judges in this case.

Plaintiff and his counsel have not presented one solitary true, relevant fact – and they have cited no law – to support their request.  Rather, they weaponized innuendo and hyperbole to construct a false narrative "of bias" and then filed it before the wrong judge, all in an effort to have another magistrate judge assigned to the case – perhaps one who would rule differently on any future "consequential" motions to unseal that might be filed.

This was an ill-considered and clumsily executed gambit.  Only a "hypersensitive, cynical, and suspicious person" would entertain these arguments knowing the real facts. *Jordan*, 49 F.3d at 156.

A finding of the Eleventh Circuit some years ago comes to mind as particularly apropos of this episode:

> [w]e believe instead that litigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters.  Further, judges have an ethical duty to "disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification."  "[B]oth litigants and counsel should be able to rely upon judges to comply with their own Canons of Ethics."[15]

Anyone who signs up for this job expects the slings and arrows that come with it.  My colleagues and I are often the subject of all sorts of complaints – even lawsuits – lodged by unhappy or disappointed litigants.  That comes with the territory.  On the other hand, my wife and her co-employees serve their community differently.  They go to work daily – for a

---

[15]  A*m. Textile Mfrs. Institute, Inc. v. The Limited, Inc.*, 190 F.3d 729, 742 (11th Cir. 1999) (citing *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995)).

non-profit organization – aiming to achieve the laudable mission of providing affordable housing to those who need it most in Greater New Orleans.  Unlike me, she didn't sign up to have her "entire career" and all of her "accomplishments" demeaned by three men whose myopic litigation worldview leads them to recklessly attack people they don't even know.  It is clear that, to these lawyers, the ends will always justify the means – even if those means include ignoring facts, the law, and the rules of ethics and professionalism.

I mentioned to Plaintiff's counsel at the hearing my belief that this entire episode is born of what I perceive to be their particular litigation philosophy – whenever in doubt, assume the worst about someone, whether it's your opponent, any lawyer with the temerity to represent your opponent, or even the judge (and his wife).  For these lawyers, there's always another enemy lurking around the corner.  This is a toxic way to approach litigation and I've said so to them and to counsel for the other parties on multiple occasions.  I hope they all finally begin to listen.

This litigation, along with the associated bankruptcy – promises to be difficult for all involved, most particularly for the many victims of sexual abuse who are Plaintiffs in this case and others.  Professional and civil conduct will be paramount throughout this litigation.

We must all be at our best.

To the extent I am involved in presiding over discovery issues in this or any other case, I will be a demanding moderator in this regard.  Beginning with the conduct of the upcoming Calamari deposition, counsel are on notice that the Court expects the very best from them going forward.  The Court, the parties, and the public are entitled to expect just that from lawyers on both sides who are as experienced and smart as these.

The motion to recuse is denied.

New Orleans, Louisiana, this __29th__ day of _____September_____, 2021.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE